**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

ALESSANDRA MORALES, Esq.,

    Plaintiff,

v.

MCDIVITT LAW FIRM, P.C., LAW FIRM OF MICHAEL W. MCDIVITT, P.C., and
MICHAEL W. MCDIVITT, Esq.,

    Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff Alessandra Morales, Esq. ("Plaintiff" or "Mrs. Morales"), by and through her

undersigned counsel, Clayton E. Wire and Emily R. Fiscus of Ogborn Mihm, LLP, submits this

Complaint and Jury Demand against Defendant McDivitt Law Firm, P.C. and Defendant Law

Firm of Michael W. McDivitt, P.C. (collectively referred to as "MLF" or the "Firm"), and

Defendant Michael W. McDivitt, Esq. ("Mr. McDivitt") (collectively, "Defendants") as follows:

<u>**INTRODUCTION**</u>

1.  In this employment action, Plaintiff Alessandra Morales, Esq., brings claims against her

    former employers, Defendant McDivitt Law Firm, P.C., Defendant Law Firm of Michael

    W. McDivitt, P.C., and Defendant Michael W. McDivitt, Esq., for interference in violation

    of the Family Medical Leave Act ("FMLA"); retaliation in violation of the FMLA; and

Extreme and Outrageous Conduct. Mrs. Morales reserves her right to bring claims against Defendants for sex and pregnancy discrimination in violation of Title VII of the Civil Rights Act, the Colorado Anti-Discrimination Act, and the Pregnancy Discrimination Act, and may amend this complaint to include such claims once they have been administratively exhausted.[1]

2. MLF is a mid-size Colorado law firm specializing in representing plaintiffs in workers compensation and personal injury claims and lawsuits.

3. Mr. McDivitt is the Founder and CEO of MLF.

4. Mrs. Morales began her employment as an intake attorney for MLF on May 12, 2014. Over the next six (6) years, Defendants repeatedly promoted Mrs. Morales to positions as a personal injury attorney in the Firm's pre-litigation department and then to a position in the litigation department.

5. Mrs. Morales demonstrated that she was highly qualified for her positions while employed by MLF, and MLF and Mr. McDivitt repeatedly commended her for her excellent performance.

6. Mrs. Morales never received a negative performance evaluation, a "write-up", or formal discipline.

7. Mrs. Morales became pregnant in July 2019, and began planning with Defendants to take maternity leave, pursuant to the FMLA.

---

[1] Mrs. Morales filed a charge of discrimination against Defendant MLF on September 14, 2020. Mrs. Morales filed a charge of discrimination against Defendant Mr. McDivitt on September 24, 2020. Mrs. Morales filed both charges with the Colorado Civil Rights Division ("CCRD"), and due to the work sharing agreement with the Equal Employment Opportunity Commissions ("EEOC"), the charge against MLF was also filed with the EEOC. Investigation is still pending in both matters.

8. MLF approved Mrs. Morales' FMLA maternity leave request for the full twelve (12) weeks of unpaid leave.

9. After Mrs. Morales announced her pregnancy and plan to take FMLA leave, in approximately December 2019, Defendants began reassigning Mrs. Morales's pre-litigation cases to a recently hired male attorney.

10. Defendants and Mrs. Morales reached an agreement that the majority of her assigned cases would be temporarily reassigned to other lawyers in the firm to monitor during her FMLA maternity leave, and that on her return from leave those cases that were still open would be reassigned to her.

11. Mrs. Morales's FMLA leave began on February 27, 2020, when her doctor(s) induced her to give birth to twins.

12. Consequently, Mrs. Morales' FMLA maternity leave was scheduled to end, and she was scheduled to return to work twelve (12) weeks later, around approximately May 22, 2020.

13. While on unpaid FMLA maternity leave, Mrs. Morales continued to work on several cases for MLF, successfully obtaining beneficial settlements.

14. Mrs. Morales also continued to bring in business for MLF through personal referrals while on unpaid FMLA maternity leave.

15. MLF laid off employees on or about March 18, 2020, March 26, 2020, and April 2, 2020, explicitly blaming the effects of the COVID-19 pandemic, but Mrs. Morales was not among those laid off.

16. While Mrs. Morales was still on FMLA maternity leave, Defendants terminated Mrs. Morales' employment on May 5, 2020.

17. Mr. McDivitt told Mrs. Morales that it was "just easier to have you not return, since your cases have already been reassigned."

18. Defendants did not terminate or lay off any other Firm employees on or about May 5, 2020.

19. Subsequent to terminating Mrs. Morales while she was on maternity leave (after having given birth to twins), Defendants interfered with Mrs. Morales' attempts to notify her clients of her departure from MLF and give those clients a choice of whether to stay with MLF or go with Mrs. Morales to her new firm, The Morales Law Firm.

20. Moreover, Defendants also interfered with the settlement of a client's case who had transitioned to Mrs. Morales' firm from MLF, by instructing the insurance company to stop payment on the settlement check.

21. By terminating Mrs. Morales and interfering with her ability to make a living, Defendants (a) interfered with the exercise of Mrs. Morales's rights pursuant to the FMLA; (b) retaliated against Mrs. Morales for taking FMLA leave; and (c) engaged in extreme and outrageous conduct that recklessly caused Mrs. Morales severe emotional distress.[2]

## JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction over Mrs. Morales' FMLA claims under 28 U.S.C. §§ 1331 and 29 U.S.C. § 2617(a)(2).

23. In addition, this Court has supplemental jurisdiction over Mrs. Morales' claims based on Colorado state law under 28 U.S.C. § 1367, because such claims form part of the same case or controversy as those claims over which the Court has original jurisdiction.

---

[2] As noted above, Mrs. Morales reserves her right to assert her sex and pregnancy discrimination claims through amendment to this Complaint, after such claims have been administratively exhausted.

24. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), as all of the events giving rise to the claims asserted herein occurred in the District of Colorado of the United States of America.

## **PARTIES**

25. Plaintiff Alessandra Morales, Esq., is a woman, who is and was a resident of the State of Colorado at all material times during the events described in this Complaint.

26. Mrs. Morales performed work for Defendants at MLF's Denver and Colorado Springs locations in Colorado at all material times during the events described in this Complaint.

27. Defendant McDivitt Law Firm, P.C., is a Colorado professional corporation with its principal office located at 19 E Cimarron St., Colorado Springs, Colorado 80903.

28. Defendant Law Firm of Michael W. McDivitt, P.C. is a Colorado professional corporation with its principal office located at 19 E Cimarron St., Colorado Springs, Colorado 80903.

29. Defendant McDivitt Law Firm, P.C. and Defendant Law Firm of Michael W. McDivitt, P.C. are both identified by the same ID Number on the Colorado Secretary of State Website: 19921029375.

30. Defendant Law Firm of Michael W. McDivitt, P.C. reflects a status of "Name Changed" on the Colorado Secretary of State Website, and reflects the name of McDivitt Law Firm, P.C. Upon information and belief, the two Defendant law firms operate as one entity.

31. Defendant Michael W. McDivitt, Esq. is an attorney, and the Founder, Owner, and CEO of Defendant McDivitt Law Firm, P.C.

32. At all times relevant, MLF was a private-sector employer, with 50 or more employees in 2019 and 2020.

33. Defendant McDivitt Law Firm, P.C. was an "employer" of Mrs. Morales within the meaning of the FMLA.

34. Defendant Law Firm of Michael W. McDivitt, P.C. was an "employer" of Mrs. Morales within the meaning of the FMLA.

35. At all times relevant, as the owner and corporate officer of the Firm, Michael W. McDivitt acted directly or indirectly in the interest of MLF, in regard to his interactions with Plaintiff.

36. At all times relevant, Defendant Mr. McDivitt possessed the power to hire and fire employees.

37. At all times relevant, Defendant Mr. McDivitt supervised and controlled MLF's employees' work schedules and/or conditions of employment.

38. At all times relevant, Defendant Mr. McDivitt determined the rate and method of payment for employees of MLF.

39. At all times relevant, Defendant Mr. McDivitt maintained employment records for the Firm's employees.

40. Mr. McDivitt was one of only a few corporate officers of the Firm with the powers enumerated in paragraphs 36 through 39, and with this degree of control over the Firm.

41. At all times relevant to this Complaint, Defendant Michael W. McDivitt was an "employer" of Mrs. Morales within the meaning of the FMLA.

42. Mrs. Morales worked in excess of 1,250 hours for MLF in 2018 and 2019.

43. Mrs. Morales worked at location(s) where MLF has at least 50 employees within 75 miles.

44. At all times relevant to this Complaint, Mrs. Morales was an "employee" and/or "eligible employee" within the meaning of the FMLA.

## GENERAL ALLEGATIONS

*Mrs. Morales Excels at MLF, Becomes a Senior Attorney and Top Producer*

45. On May 12, 2014, Mrs. Morales began her employment at MLF as an intake attorney in the Firm's personal injury department.

46. Within three months of the beginning of her employment, Defendants promoted Mrs. Morales from the Firm's intake department to the Firm's pre-litigation department.

47. By March 2016, Mrs. Morales produced the second highest amount of receipts, as well as the highest number of demands, as compared to all other pre-litigation attorneys.

48. In approximately spring 2018, Defendants transitioned Mrs. Morales from the pre-litigation department into the litigation department.

49. Mrs. Morales brought in some of the highest settlement amounts to MLF between 2017 and 2019, as both a pre-litigation and litigation attorney.

50. Mrs. Morales received several awards and recognition from professional associations in 2018 and 2019 due to her success as an attorney.

51. Defendants were aware of Mrs. Morales' receipt of these awards, and used her awards to market the Firm, as reflected in the social media posts below showing photographs of Mrs. Morales with Defendant McDivitt and his son David McDivitt:







52. Mrs. Morales served as the only Spanish-speaking attorney in the Firm, which allowed

MLF to advertise, cater to, and represent a much broader range of clients.

53. Defendants repeatedly had Mrs. Morales appear in Spanish language ads and television

interviews to market the Firm, as reflected in an MLF social media post and a screen shot

from one of MLF's Spanish language advertisements:





54. Aside from her supervisor, Mrs. Morales was both the most senior and the top producing attorney in MLF's personal injury litigation department at the time she announced her pregnancy.

55. MLF considered Mrs. Morales a "crucial attorney in our litigation department" just months before she announced her pregnancy and intent to take FMLA leave, as reflected in the Firm's social media post:



*Mrs. Morales Becomes Pregnant and Announces her Intent to Take FMLA Maternity Leave*

56. After struggling with infertility, in July 2019, Mrs. Morales and her husband became pregnant with twins.

57. Based on the working environment and Mr. Morales' knowledge of Mr. McDivitt's approach, she felt worried to announce her pregnancy and intent to take FMLA maternity leave to Defendants.

58. Not knowing how Defendants would receive the news of her pregnancy and intent to take FMLA leave, the first person Mrs. Morales notified at MLF was the Firm's Human Resources Representative/Hiring and Benefits Coordinator, Judy Hamilton.  Mrs. Morales sought approval and advice from Ms. Hamilton.

59. Next, in September 2019, Mrs. Morales informed Defendants of her pregnancy and of her doctors' classification that her pregnancy was high risk because of her past complicated medical history and because she was having twins.  **Exhibit A.**

60. Mrs. Morales included the following photos in emails to Defendants announcing and updating the Firm about her pregnancy:

 

61. Mrs. Morales informed Defendants that as a result of her high-risk pregnancy, her doctors encouraged her to "take it easy," but Mrs. Morales reassured Defendants that she would make every effort to continue working hard and achieving strong results throughout her pregnancy.  **Exhibit A.**

62. Previously, in approximately March 2019, Mrs. Morales shared the fact of her fertility challenges with Karen McDivitt, Lisa McDivitt-Bush, and Ms. Judy Hamilton.

63. In October 2019, Mrs. Morales continued her conversations with MLF's Human Resources Representative, about the process of taking FMLA leave following the birth of her children.

64. MLF's Human Resources Representative stated she was not aware of a process for salaried employees, such as Mrs. Morales, to take FMLA maternity leave, because to her knowledge MLF had not previously had a female attorney take maternity leave.  MLF's Human Resources Representative stated she would look into the issue and get back to Mrs. Morales.

65. Ultimately, Defendants recognized the FMLA required the Firm to allow Mrs. Morales to exercise her right to take twelve (12) weeks for maternity leave, but told Mrs. Morales that the Firm would not offer paid leave.

66. During the time in which Mrs. Morales worked with MLF to schedule her FMLA leave, in late 2019 and early 2020, MLF employed approximately 90 employees.

67. Mrs. Morales completed all necessary paperwork, and took all actions necessary to provide notice to Defendants of her upcoming FMLA leave.

68. Both before and during Mrs. Morales' maternity leave, Ms. Hamilton and others at MLF confirmed that the leave was approved and pursuant to the FMLA.

***MLF Reassigns Mrs. Morales's Pre-Litigation Personal Referral Cases***

69. In early December 2019, Mr. McDivitt directed Mrs. Morales to reassign all of her clients in the pre-litigation phase to a newly hired male attorney.  All of these clients were Mrs. Morales' personal referrals.

70. During that conversation, Mr. McDivitt stated he did not want Mrs. Morales to be "overwhelmed," that she had too many personal referrals (and thus, pre-litigation cases), and that he did not believe she could handle all of her cases.

71. Mrs. Morales understood Mr. McDivitt's stated belief that she could not handle all of her cases was due to her pregnancy and anticipated FMLA maternity leave.

72. On information and belief, MLF did not require any male attorneys to reassign their pre-litigation personal referral clients.

73. Defendants' actions resulted in a decrease in Mrs. Morales' pay by removing approximately thirteen (13) clients, and therefore decreasing her total compensation on those cases.

74. Prior to this reassignment of pre-litigation cases, Mrs. Morales had not complained of being overworked, nor had she requested relief.

75. Prior to the reassignment, Mrs. Morales had successfully handled the same number of cases that she had in December 2019 in months and years prior.

76. It was not until after Mrs. Morales announced her pregnancy and intent to take FMLA leave that MLF pulled not only her pre-litigation cases, but her personal referral cases, away from her.

77. Around December 2019, Mrs. Morales observed a distinct shift in Mr. McDivitt's treatment of her.  Prior to her pregnancy, Mr. McDivitt spoke with Mrs. Morales in a friendly manner, and commended her in Firm-wide meetings as a top lawyer. After she announced her pregnancy and intent to utilize her full FMLA maternity leave, Mr. McDivitt treated her

differently in a negative way, including avoiding conversations with Mrs. Morales, refusing to acknowledge her, and treating her as *persona non grata*.

***Mrs. Morales Works for MLF Through Complications with Her Pregnancy and Up to the Day Before She Was Induced to Give Birth to Twins***

78. On approximately December 25, 2019, Mrs. Morales was hospitalized with a 102-degree fever and suffering from a kidney infection and a urinary tract infection, all related to her pregnancy.

79. Notwithstanding her condition and hospitalization, Mrs. Morales worked tirelessly from her hospital bed to settle a high value case for an MLF client.

80. Mrs. Morales' husband took a photograph of Mrs. Morales working on MLF cases during her hospitalization:



81. Despite being hospitalized and ill, Mrs. Morales was able to settle the MLF case and immediately made her supervisor aware of this.

82. Her supervisor made Mr. McDivitt aware that Mrs. Morales settled MLF's case.  Mrs. Morales' supervisor told her that Mr. McDivitt was "thrilled."

83. Prior to her pregnancy and announced intent to take FMLA maternity leave, Mr. McDivitt would reach out and personally congratulate Mrs. Morales for settlements of much lesser values, and would personally commend and compliment her. After the settlement of the case in late December 2019, however, Mr. McDivitt did not say a word to Mrs. Morales about this high-value, exciting settlement.

84. Mrs. Morales' supervisor, Mr. Lomena, encouraged Mrs. Morales to work harder while hospitalized to bring in payment by the end of the year.

***Prior to Approved FMLA Leave, Defendants and Mrs. Morales Reach an Agreement Regarding Temporary Reassignment of Cases Until Return from Leave***

85. In the months leading up to her FMLA maternity leave, Mrs. Morales spoke with Mr. Lomena and Amy Christensen (Personal Injury Supervisor) to coordinate coverage and temporary reassignment of the majority of her cases, while she was out.

86. Eventually, Defendants and Mrs. Morales reached an agreement under which the majority of her litigation cases would be temporarily reassigned and covered by other lawyers in the Firm, and that all such cases that were still open when she returned from leave would be reassigned to Mrs. Morales.

87. On March 2, 2020, just days after Mrs. Morales' FMLA leave began, Ms. Christensen sent an email to MLF staff and attorneys describing this agreement, and stating, in pertinent part, as follows:

As we all know, Ale has officially commenced her maternity leave and will return in June.  We have now moved all necessary cases to either Leah, Cristin, Rebekah, Chris or Ed to handle for Ale while she's out.  If the cases are still open when she returns, she will resume handling.  Therefore, please make sure that we have filed an Entry of Appearance for the attorney(s) who have taken over handling of the file merely while Ale is out on leave.  If you have not done so yet, please do so now.  Please note that we will not withdraw her from the cases, merely just add the additional attorney.  With that being said, please bring your new attorney up to speed with the status of these cases.

**We appreciate everyone stepping in to help with these cases while Ale is enjoying being a new mom to her brand new twins!!**

**Exhibit B.**

88. Had Mrs. Morales not taken FMLA leave, her litigation cases would not have been reassigned to other lawyers.

89. Upon information and belief, based on Mrs. Morales' observations in the workplace and discussions with co-workers, Defendants routinely reassigned cases back to attorneys that took FMLA leave.

90. For example, a male attorney took a substantial period(s) of FMLA leave for family reasons.

91. Defendants reassigned that male attorney's cases back to him upon his return to work.

92. As another example, a second male attorney took approximately two (2) months of leave for childcare purposes.

93. Defendants reassigned that second male attorney's cases back to him upon his return to work.

94. During that time the second male attorney was out on leave, Defendants directed Mrs. Morales and other attorneys not to contact that male attorney, and instead, to contact another supervisor in the event questions arose.

95. Upon information and belief, based on Mrs. Morales' conversations with former co-workers, the second male attorney was not required to submit paperwork or documentation for FMLA leave.

***Mrs. Morales Provides Notice of FMLA Leave, MLF Approves Such Leave, and Mrs. Morales Starts Her Leave***

96. In her initial email on September 9, 2019, to Michael McDivitt, David McDivitt, Karen McDivitt (President of MLF), and Lisa McDivitt Bush (Director of Marketing), Mrs. Morales informed Defendants that (1) she was pregnant with twins, (2) due to give birth in March 2020 (3) had a high risk pregnancy, (4) she had given MLF's HR representative medical paperwork, and (5) she would be working with MLF's HR and administrative staff to coordinate and plan for maternity leave. *See* **Exhibit A.**

97. In October 2019, Mrs. Morales informed Judy Hamilton (Human Resources Representative) of her intention to apply for and take maternity leave when her twins were born, with her estimated due date around approximately March 2020.

98. Upon information and belief, Ms. Hamilton sought advice and/or counsel from Cassandra Melson (Director of Finance) who consulted with Defendants' legal counsel to learn the process for salaried employees, such as Mrs. Morales, to take FMLA maternity leave.

99. From October to November 2019, Mrs. Morales continued to work with Ms. Hamilton to get all FMLA leave notice and information in place.

100.  On November 8, 2019, Mrs. Morales emailed Ms. Hamilton and a person from the IT department regarding her attempt to note her calendar with maternity leave from March to June 2020, requesting their assistance.

101.  On February 4, 2020, Mrs. Morales emailed Ms. Hamilton regarding her request to follow up about adding her husband back on to her health insurance, as her husband recently started his own business.  Mrs. Morales also asked Ms. Hamilton additional questions regarding her FMLA maternity leave.  **Exhibit C.**

102.  On February 5, 2020, Ms. Hamilton replied to Mrs. Morales via email indicating that she was in the process of adding Mrs. Morales' husband to Mrs. Morales' health insurance.  **Exhibit D.**

103.  Ms. Hamilton also attached a FMLA Benefits Letter to the email she sent to Mrs. Morales on February 5, 2020.  **Exhibit E.**

104.  On February 25, 2020, Mrs. Morales notified Ms. Hamilton that she planned to begin her maternity leave in March, as her doctors planned to induce her at the end of February.  Mrs. Morales asked Ms. Hamilton if MLF needed anything from her.  **Exhibit F.**

105.  On February 26, 2020, Ms. Hamilton replied to Mrs. Morales providing well wishes.  Ms. Hamilton did not say that MLF needed any additional notice or documentation from Mrs. Morales.  **Exhibit G.**

106.  On February 26, 2020, Mrs. Morales emailed MLF leadership to provide notice that her FMLA maternity leave would begin the following day, February 27, 2020, because her doctor had ordered her to be induced.  **Exhibit H.**

107.  On February 28, 2020, Mrs. Morales gave birth to twins.

108.  On March 1, 2020, Mrs. Morales emailed Defendant Michael McDivitt, David McDivitt, Lisa McDivitt-Bush, and Karen McDivitt, sharing that "The McDivitt Law Firm Family just got a little bigger!" with the following picture:



**Exhibit I.**

109.  Around approximately March 19, 2020, Mrs. Morales emailed Ms. Hamilton to ask whether MLF required additional information from her doctor to support her leave, to which Ms. Hamilton replied and confirmed "[y]our FMLA is complete you don't need anything else." **Exhibit J.**

110.  Mrs. Morales complied with MLF's usual and customary requirements for requesting leave.

111.  The birth of Mrs. Morales' twins entitled her to 12 weeks of leave under the FMLA.

112.  Despite being pregnant and suffering associated medical issues, at the time she left on FMLA maternity leave, Mrs. Morales had exceeded her performance year-to-date projection numbers for settlements.

*Mrs. Morales Continues to Work While on Unpaid FMLA Leave*

113. On February 26, 2020, Mrs. Morales emailed Amy Christensen (Personal Injury Supervisor) and others, stating that she would keep, and continue to work on, three cases while on maternity leave.

114. Defendants did not take any action to notify Mrs. Morales that Defendants did not authorize her to work while on unpaid FMLA leave.

115. Over the next ten (10) weeks after the birth of her twins, Mrs. Morales continued to work on approximately 25 cases (the majority of which had purportedly been "reassigned" to other attorneys) for MLF.

116. Throughout her FMLA maternity leave, Mrs. Morales responded to numerous text messages, emails, and phone calls initiated by MLF leadership, supervisors, and employees on a weekly basis.

117. While on FMLA, Mrs. Morales also continued to bring in new business for MLF.

118. While on FMLA maternity leave, Mrs. Morales settled three cases for MLF.

119. Mrs. Morales' husband took a photograph of her working on MLF cases, just weeks after the birth of their twins:



*Months Before Terminating Mrs. Morales, MLF Terminates Several Employees Purportedly Because of the Impact of the COVID-19 Pandemic*

120.  On March 18, 2020, David McDivitt, MLF's COO, sent an email notifying MLF employees that the Firm had terminated three (3) employees.  David McDivitt listed the three (3) employees by name.

121.  David McDivitt mentioned in that email the then-beginning pandemic and stated that the terminations were "[i]n order to remain flexible and more able to nimbly adapt to some of these external market factors in this rapidly-changing economy…"

122.  David McDivitt went on to state that "[w]hat comes next is likely to merely be a realignment of certain job responsibilities during this temporary remote-work environment."

123.  All three (3) employees that MLF terminated on or around March 18, 2020 were female.

124.  On March 26, 2020, Defendant Michael McDivitt sent an email to all Firm employees, explaining that MLF "successfully completed a nearly 100% remote operation" and that due to the remote capability, MLF had "not demonstrated any significant loss of efficiency."

125.  On April 2, 2020, Defendant Michael McDivitt sent an email to all Firm employees, announcing the layoff of sixteen (16) employees, eleven (11) of which were female.

126.  Defendant Michael McDivitt stated in that email that "[w]ithout this significant reduction we would be in an untenable and unsustainable economic situation."

127.  In that email, Defendant Michael McDivitt also announced pay cuts for all attorneys.

128.  On information and belief, based on Mrs. Morales' conversations with current or former MLF employees, MLF reinstated all of the pre-litigation attorneys' salaries and commission percentages back to their previous levels in approximately Fall 2020.

129.  One of the people whose layoff was announced by Defendant Michael McDivitt on April 2, 2020 was the male attorney to whom Defendants had ordered Mrs. Morales to transfer her pre-litigation personal referrals to in December 2019.

130.  Had Mrs. Morales not been out on FMLA maternity leave at this time, those pre-litigation cases would have been reassigned back to her.

131.  On April 20, 2020, Defendant Michael. McDivitt sent an email to all Firm employees, announcing the termination of three (3) more employees. All three (3) were female.

132.  On April 20, 2020, Defendant Michael McDivitt wrote that he was "very hopeful that our current staff and Attorney count will allow us to ride through the balance of this 'storm.'"

133.  In each email announcing the layoff of employees in March and April 2020, Defendants specifically blamed the reduction in intakes and alleged financial issues caused by the ongoing pandemic.

134.  In laying off employees and reducing attorney salaries and commissions, MLF took
significant steps to mitigate any potential financial impact related to the COVID-19
pandemic.

*MLF Receives $1.29 Million in Forgivable Paycheck Protection Program Funds*

135.  On April 7, 2020, MLF received $1.29 million in government stimulus funds under the
Paycheck Protection Program ("PPP").[3]

136.  The U.S. Small Business Administration states that the Paycheck Protection Program is a
loan designed to provide a direct incentive for small businesses to keep their workers on the
payroll and that such loans are forgivable.[4]

*Defendants' Business Model Insulates the Firm from Immediate Financial Impact*

137.  MLF's business model and departments are structured such that a reduction in intakes for
new cases does not immediately result in a reduction in fee generation, as cases do not
settle for months or years after they come in the door.

138.  Because the statute of limitations for motor vehicle accident personal injury claims is
three (3) years, this means that as of March 2020, MLF had cases in its pre-litigation
department for clients whose accidents occurred in 2017.

139.  Consequently, any reduction in intakes in March 2020 would not translate to a reduction
in fees earned by MLF until several years later.

140.  Further, the litigation department at MLF, which Mrs. Morales was part of, was only
responsible for cases for which a complaint had been filed.

---

[3] *Available at* https://covidbailouttracker.com/mcdivitt-law-firm (URL shortened).
[4] *Available at* http://bit.ly/3hW6dul (URL shortened).

141.  Generally, a complaint in a motor vehicle accident case will not be filed for two (2) or

three (3) years after the initial accident and intake.

142.  Consequently, a reduction in intakes in March and April 2020 would have no effect on

the number of cases in the litigation department for several years.

***MLF Reports Great Financial Success for April 2020***

143.  On May 1, 2020, Mr. Lomena sent an email to the MLF's Personal Injury Department,

stating that April 2020 was maybe the best month he had seen since he had been with the

Firm (approximately 7 years), with approximately 146 settlements, totaling $5,600,000:

> Huge April numbers. Maybe the best month I have seen since I have been here. Approximately 146 settlements, totaling $5,600,000. Both groups hit revenue goal with approximately $1,600,000 in fees.
>
> Congrats team!!! Your hard work is greatly appreciated.  Special shout out to Joe and Tony who both settled over $1,000,000 this month. I don't believe we have ever had two attorneys do that in a single month.
>
> Pandemic and all you are putting in incredible effort and pulling in unprecedented numbers. It is a pleasure working with you all!

**Exhibit K.**

144.  In the same email, Mr. Lomena reported approximately $1,600,000 in fees for MLF.

145.  Importantly, Mr. Lomena noted MLF's financial success despite COVID-19, stating

"[p]andemic and all . . . [MLF is] pulling in unprecedented numbers."

***MLF and Mr. McDivitt Terminate Mrs. Morales in Violation of the FMLA***

146.  On May 5, 2020, a month after Defendants received the PPP funds and days after

reporting unprecedented financial success, Mr. McDivitt and Mr. Lomena called Mrs.

Morales, just weeks before she was set to return from FMLA maternity leave.

147.  During this call, Mr. McDivitt told Mrs. Morales that he was terminating her

employment.

148.  Mr. McDivitt initially stated the termination was purportedly because of the financial issues caused by the COVID-19 pandemic.

149.  Mrs. Morales expressed her shock and hurt, as well as her fear of what being unemployed would mean for her young family during a global pandemic.

150.  When Mrs. Morales pressed Mr. McDivitt and asked why she was being terminated, Mr. McDivitt stated "it's just easier not to bring you back."

151.  Mr. McDivitt further stated "all of your cases are already reassigned to other attorneys now so it's just easier to keep them assigned to those other attorneys."

152.  When Mrs. Morales pointed out that she had devoted six (6) years of loyal work to the Firm, that she was MLF's most senior attorney in the litigation department (aside from her direct supervisor), and that she served as a top producer, Mr. McDivitt stated that "there are a lot of other factors that go into this."

153.  Mrs. Morales asked what other factors contributed to his decision. Mr. McDivitt simply stated, "I'm afraid I just don't have a good answer for you."

154.  Mr. McDivitt was unable or unwilling to state any other "factors" that contributed to her termination.

155.  As a new mother of twin infants and the primary breadwinner in her family, Mrs. Morales pleaded, appealing to Mr. McDivitt's sense of family, asking "how could you do this to me?  I just had babies and have two little mouths to feed."

156.  In response, Mr. McDivitt raised his voice at Mrs. Morales, stating "there's nothing else to say, this conversation is over."

157.  Mr. McDivitt terminated Mrs. Morales with full knowledge that she had just given birth, and with knowledge of the difficulty that personal injury lawyers were facing in acquiring new clients during the COVID-19 pandemic.

158.  Despite him raising his voice at her, Mrs. Morales asked Mr. McDivitt what the status of the clients personally referred to her would be, and how Defendants planned to notify such clients of her termination.

159.  In response, Mr. Lomena stated that under the ethical rules and guidelines, MLF would have to notify its clients that Mrs. Morales was leaving.

160.  Mr. McDivitt abruptly interrupted Mr. Lomena and yelled "Ed, stop talking!  Ed, I told you we're not doing that, and we're not discussing this!"

161.  Mrs. Morales stated that her understanding of the Professional Rules of Conduct was that all of her clients, not just her personal referrals, needed to be notified of her departure from the Firm and of their options.  To which Mr. McDivitt responded "we don't do that here, and we're not doing that for you."

162.  Mr. McDivitt then further justified his position by stating to Mrs. Morales that ethical rules only apply to attorneys with cases assigned to them at the time of their termination, and that because Mrs. Morales was on FMLA leave, technically she had no cases assigned to her.

163.  In other words, because Mrs. Morales was on FMLA maternity leave after a difficult pregnancy and birth, she would not receive the same treatment as other lawyers who separated from the Firm.

164. On information and belief, when Defendants terminated the male attorney that became responsible for Mrs. Morales' pre-litigation cases after reassignment in December 2019, Defendants provided that male attorney with his full client list to facilitate informing all of his clients about his departure from the Firm, consistent with the Rules of Professional Conduct.

165. On May 7, 2020, Defendants sent an email to the Firm stating simply that Mrs. Morales "is no longer with the firm." **Exhibit L.**

166. This email did not include any reference to the COVID-19 pandemic.

167. The email sent by Defendants to announce Mrs. Morales' termination stands in contrast to the prior announcements of layoffs from Defendants in March and April, which specifically attributed the termination of employees to the pandemic.

168. Defendants did not terminate or layoff any other attorneys at the Firm after May 5, 2020, through at least January 2021.

169. Subsequent to terminating Mrs. Morales, Defendants now claim that "MLF's decision to discharge Mrs. Morales was made solely due to the significant downturn in its business caused by COVID-19…"

***MLF Creates Difficult and Distressing Situations for Mrs. Morales Following Her Termination***

170. Mrs. Morales turned to the best option for her and her family following her termination: starting her own solo law practice.

171. During the termination call, Mr. McDivitt told Mrs. Morales the Firm would not cooperate in sending notice to clients of their right to go with Mrs. Morales.

172.  Then, Defendants subsequently refused to provide mutual notice to the full scope of clients that Mrs. Morales represented prior to her leave.

173.  When Mrs. Morales, through counsel, stated that she reserved the right to contact such clients unilaterally, MLF apparently contacted the majority of such clients without prior notice to Mrs. Morales.

174.  On information and belief, based on the context of the communications and reports back to Mrs. Morales from her former clients, Defendants intended such unilateral communications to dissuade clients from transitioning to Mrs. Morales.

175.  Defendants refused to provide Mrs. Morales with a comprehensive list of the clients she had represented prior to her leave, despite the fact that MLF had provided such a list to other departing male attorney(s).

176.  Shortly after Defendants terminated Mrs. Morales, Mrs. Morales notified Mr. McDivitt that some personally referred clients intended to terminate their representation by MLF, and subsequently become represented by her.

177.  On May 6, 2020, Defendants, through counsel, represented to Mrs. Morales that Defendants would discuss division of fees with Mrs. Morales based on principles of *quantum meruit*.

178.  On approximately May 6, 2020, Defendants, through counsel, presented Mrs. Morales with proposed Separation Agreement that conditioned Mrs. Morales' receipt of a monetary amount from MLF upon her waiver and release her claims against Defendants.

179.  That proposed Separation Agreement did not contain any provision to address the division of fees based on principles of *quantum meruit* in cases in which the clients elected to terminate representation by MLF and become represented by Mrs. Morales.

180.  On approximately May 8, 2020, Mrs. Morales conveyed to Mr. Lomena her concern that she would not be able to provide for her babies, that her husband took a huge financial hit due to COVID-19, and that she was in a tough financial position given her unemployment.

181.  On May 10, 2020, Plaintiff's first Mother's Day as a new mother, Defendants' attorney called and emailed Mrs. Morales to discuss revisions to the previously proposed Separation Agreement.  The revisions included the addition of a provision to address the division of fees based on principles of *quantum meruit.*

182.  It appeared to Mrs. Morales that Defendants made that "concession" in the proposed Separation Agreement in an attempt to use it as leverage to induce her to sign the proposed Separation Agreement.

183.  On May 12, 2020, Mrs. Morales informed Defendants' attorney that she would not sign or accept the Separation Agreement proposed by Defendants.

184.  Later that same day, Defendants took actions that interfered with Mrs. Morales' ability to represent her clients, resolve her clients' claims, and earn her fees.

185.  Defendants' interference caused Mrs. Morales to experience fear for the viability of her fledgling law firm, her law license, her professional reputation, and her ability to earn a living to support her family.

186.  Defendants interfered with Mrs. Morales' ability to represent her clients and earn a living, while knowing Mrs. Morales had not earned any income from being on unpaid

maternity leave, that her husband had recently become self-employed, and that she possessed financial concerns.

***Mrs. Morales Suffers Severe Ongoing Mental, Emotional, and Physical Injuries as a Result of Defendants' Outrageous Conduct***

187.  The manner and context of Defendants' termination of Mrs. Morales, and the subsequent intentional interference with her livelihood and representation of her clients, constitute extreme and outrageous conduct.

188.  As a result of Defendants' extreme and outrageous conduct, Mrs. Morales suffered, and continues to suffer, severe nightmares, sleeplessness, hopelessness, sadness, nervousness, depression, and anxiety.

189.  As a result of Defendants' extreme and outrageous conduct, Mrs. Morales felt deeply upset, very irritable, despair and concern about her new firm or job prospects, angry, very emotional, embarrassed, and humiliated.

190.  As a result of the stress, anxiety, emotional distress, and fear, Mrs. Morales cried frequently, and had nightmares that involved Mr. McDivitt's unlawful treatment of her.

191.  Mrs. Morales experienced interruption in her ability to work from time to time, as her nervousness, extreme emotional distress, and fear would take over her thoughts.

192.  Mrs. Morales felt tense, and more stressed than she ever had before.

193.  Mrs. Morales' husband observed a distinct shift in Mrs. Morales' emotional state.

194.  As a result of the stress, anxiety, sleeplessness, and depression that Mrs. Morales suffered as a result of Defendants' conduct, she sought treatment with a counselor for the first time in her life.

195.  Mrs. Morales continues to seek treatment from a counselor for the physical harms and

emotional distress Defendants caused her.

**FIRST CLAIM FOR RELIEF**
Interference in Violation of the Family Medical Leave Act, 29 U.S.C. § 2615(a)(1)
Against Defendant MLF and Defendant Mr. McDivitt

196.  Plaintiff incorporates allegations in paragraphs 1-195 of this Complaint and Jury Demand

into this Claim for Relief.

197.  At all material times, Plaintiff was an eligible employee within the meaning of the

FMLA.

198.  At all material times, Defendants MLF was an "employer" of Plaintiff within the

meaning of the FMLA.

199.  At all times relevant, as the owner and corporate officer of the firm, Michael W. McDivitt

acted directly or indirectly in the interest of MLF, in regard to his interactions with

Plaintiff.

200.  Defendant Mr. McDivitt 1) Possessed the power to hire and fire employees; 2)

Supervised and controlled employees' work schedules or conditions of employment; 3)

Determined the rate and method of payment; and 4) Maintained employment records.

201.  At all material times, Defendant Mr. McDivitt was an "employer" of Plaintiff within the

meaning of the FMLA.

202.  The birth of Plaintiff's twins entitled her to 12 weeks of leave under the FMLA.

203.  At all material times, Plaintiff was qualified for her position, and was a top producer for

Defendants.

204.  Plaintiff was entitled to be returned to employment after her FMLA leave and restored to the same, or a substantially similar position, with equivalent pay and benefits.

205.  Pursuant to her agreement with Defendants, Plaintiff was also entitled to be reassigned her caseload upon her return.

206.  Plaintiff provided Defendants with timely notice of her need to take FMLA leave.

207.  Defendants terminated Plaintiff on May 5, 2020, while she was on protected FMLA leave.

208.  Defendants used Plaintiff's FMLA leave as a negative factor in deciding to terminate her.

209.  Defendants unlawfully interfered with Plaintiff's rights under the FMLA.

210.  Defendants' termination of Plaintiff's employment and other adverse actions were related to her exercise of her FMLA rights.

211.  Defendant MLF is liable for the acts and omissions of its agents, including Defendant Mr. McDivitt.

212.  Defendant Mr. McDivitt is individually liable for his violations of the FMLA.

213.  Defendants' unlawful employment practices were intentional and willful.

214.  Because of Defendants' unlawful interference with Plaintiff's right to be reinstated under the FMLA, Plaintiff has experienced injuries, damages, and losses.


**<u>SECOND CLAIM FOR RELIEF</u>**
Retaliation & Discrimination in Violation of the Family Medical Leave Act, 29 U.S.C. §
2601
Against Defendant MLF and Defendant Mr. McDivitt

215.  Plaintiff incorporates allegations in paragraphs 1-214 of this Complaint and Jury Demand into this Claim for Relief.

216.  Plaintiff availed herself of a protected right under the FMLA when she took maternity leave for the purposes of childbirth, recovering therefrom, and caring for her newborn infants.

217.  After Plaintiff exercised her rights under the FMLA, Defendants discriminated and retaliated against her by, *inter alia*, terminating her, failing to reinstate her to her position or a substantially similar position, initially refusing to comply with ethical rules and guidelines, and treating her more poorly than male employees.

218.  In the month prior to Plaintiff's termination, Defendants experienced a financial windfall in the form of a stimulus payment through the Paycheck Protection Program ("PPP").

219.  In the month prior to Plaintiff's termination, Defendants also experienced financial success in the course of regular business, generating $1.6 Million in fees.

220.  Defendants' proffered reason for Plaintiff's termination was financial difficulties due to the COVID-19 pandemic.

221.  During the termination call, Defendants also offered the reasoning that it would be easier not to bring Plaintiff back from FMLA leave.

222.  Defendants did not cite any performance issues in the reasoning for Plaintiff's termination.

223.  Defendants' discrimination and retaliation against Plaintiff occurred because of, and in response to, her exercise of her rights under the FMLA.

224.  Defendants used Plaintiff's FMLA leave as a negative factor in deciding to terminate her.

225.  Defendants' unlawful employment practices were intentional and willful.

226. After Plaintiff notified Defendants of her request for leave, Defendants demonstrated discriminatory intent by, *inter alia*, reassigning Plaintiff's pre-litigation cases to a male attorney, urging Plaintiff to work while hospitalized due to pregnancy complications, and by Defendant Mr. McDivitt exhibiting a negative shift in tone and interaction with Plaintiff.

227. On information and belief, based on conversations with former employees, Defendants have previously terminated female employees shortly after they took FMLA maternity leave.

228. Defendant MLF is liable for the acts and omissions of its agents, including Defendant Mr. McDivitt.

229. Defendant Mr. McDivitt is individually liable for his violations of the FMLA.

230. Defendants' alleged reason for terminating Plaintiff is pretext for unlawful retaliation and discrimination against Plaintiff for taking protected FMLA leave.

231. Because of Defendants' unlawful retaliation against Plaintiff, Plaintiff has experienced injuries, damages, and losses.

## THIRD CLAIM FOR RELIEF
Extreme and Outrageous Conduct/Intentional Infliction of Emotional Distress
Against Defendant MLF and Defendant Mr. McDivitt

232. Plaintiff incorporates allegations in paragraphs 1-231 of this Complaint and Jury Demand into this Claim for Relief.

233. Defendants terminated Plaintiff just over two months after the birth of her twins.

234.  Defendants knew that Plaintiff was post-partum, after a high risk and difficult pregnancy, after being hospitalized near the end of her pregnancy, and after struggling to become pregnant.

235.  Defendant did not give Plaintiff any notice prior to terminating her.

236.  Defendant knew that Plaintiff did not have any other employment opportunities lined up, that her only option was to start her own solo practice, and that personal injury attorneys were having difficulty acquiring new cases due to the pandemic.

237.  Defendants terminated Plaintiff the month after receiving $1.29 million in forgivable PPP funds, which were supposed to be used to retain employees such as Plaintiff.

238.   Defendants terminated Plaintiff just days after announcing an unprecedented successful month of business.

239.  Defendant MLF knew that Plaintiff recently added her husband to her health insurance coverage through MLF, as he was attempting to start his own business, and that he took a huge financial hit due to COVID-19.

240.  Upon information and belief, based on Plaintiff working with Human Resources to add her husband onto her health insurance plan through MLF, and through Plaintiff's communications with Mr. Lomena regarding her husband's financial hit, Defendant Mr. McDivitt knew of Plaintiff's financial concerns.

241.  After terminating Plaintiff, Defendants initially refused to cooperate with Plaintiff to inform her clients of her departure, intentionally interfered with Plaintiff's ability to start her own law firm, and intentionally caused severe emotional distress to Plaintiff in an attempt to pressure her into signing a severance agreement waiving her claims.

242.  Defendants contacted Plaintiff's former clients and encouraged them to stay with MLF at the same time that Plaintiff sought to work with Defendants to issue statements to her clients.

243.  Defendants knowingly interfered with Plaintiff's ability to represent her clients and to resolve her clients claims.  In doing so, Defendants caused Plaintiff severe emotional distress.

244.  Defendants' actions in connection to Plaintiff's termination and interfering with her ability to start her own firm and earn a living caused Plaintiff severe emotional distress.

245.  Plaintiff has been forced to seek counseling for the physical and mental health concerns caused by Defendants' conduct.

246.  Defendants' committed these acts recklessly, without regard for Plaintiff's financial or emotional state as a now-unemployed new mother of twins, living through a global pandemic.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests:

1.  That this Court assume jurisdiction;

2.  That this Court enter judgment in Plaintiff's favor and against Defendants;

3.  That this Court declare the actions of Defendants described in this Complaint and Jury Demand to be unlawful Interference with Plaintiff's protected leave pursuant to the Family Medical Leave Act;

4.  That this Court declare the actions of Defendants described in this Complaint and Jury Demand to be unlawful Retaliation and/or Discrimination because of Plaintiff's protected leave pursuant to the Family Medical Leave Act;

5.  That this Court declare the actions of Defendants in connection with Plaintiff's termination and subsequent efforts to interfere with her law practice to be Extreme and Outrageous Conduct;

6.  That this Court award Plaintiff all relief as allowed by law and equity, including, but not limited to the following:

    a.  Backpay, in an amount to be determined at trial;

    b.  Reinstatement, or Front pay, *in lieu* of reinstatement;

    c.  Compensatory and consequential damages, including but not limited to emotional distress damages, in amounts to be determined at trial;

    d.  Injunctive or equitable relief as appropriate;

    e.  Attorneys fees and costs, including expert costs, as provided for by law;

    f.  Liquidated damages for all claims allowed by law and as determined at trial;

    g.  Punitive damages for all claims allowed by law and as determined at trial;

    h.  Pre- and post-judgment interest at the highest lawful rates; and

7.  That this Court award such additional or alternative relief as may be just, proper, and equitable.

## JURY TRIAL DEMAND

Plaintiff respectfully demands a trial by jury on all issues so triable.

Respectfully submitted this 7th day of May, 2021.

*/s/ Clayton Wire*
Clayton E. Wire, #41717
Emily R. Fiscus, #49089
OGBORN MIHM, LLP
1700 Lincoln Street, Suite 2700
Denver, Colorado 80203
Phone: 303-592-5900
Fax:     303-592-5910
Clayton.Wire@omtrial.com
Emily.Fiscus@omtrial.com
*Attorneys for Plaintiff*

Plaintiff's Mailing Address:
P.O. Box 740220
Arvada, CO 80006